UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )          Case Number
                               )
                v.             )    1:18-cr-425-SCJ-JSA-1
                               )
BRODERICK LEWIS TAYLOR,        )
                               )
            Defendant.         )
_____)


                Transcript of a suppression hearing

                before Magistrate Judge Justin S. Anand

                     March 29, 2019; 9:44 a.m.

                        Atlanta, Georgia


Appearances:

For the Plaintiff: WILLIAM G. TRAYNOR
                   Assistant U.S. Attorney
                   600 United States Courthouse
                   75 Ted Turner Drive, SW
                   Atlanta, Georgia  30303


For the Defendant: SUZANNE HASHIMI
                   Assistant Federal Public Defender
                   101 Marietta Street, NW
                   Atlanta, Georgia  30303


        Proceedings recorded by mechanical stenography,
transcript produced by computer.
_____

                Diane Peede, RMR, CRR, CRC
              Federal Official Court Reporter
             75 Ted Turner Drive, SW, Suite 2194
                Atlanta, Georgia  30303-3309

Index of transcript

Page

Christopher Jones

Direct by Mr. Traynor. . . . . . . . . . . . . . . 5
Cross by Ms. Hashimi . . . . . . . . . . . . . . .18
Redirect by Mr. Traynor. . . . . . . . . . . . . .27


Christopher Jones (recalled)
Direct by Ms. Hashimi. . . . . . . . . . . . . . .30


- - - - - - - -

```
 1                    P R O C E E D I N G S
 2              (Call to the order of the Court.)
 3              THE COURT:  This is the case of the United States
 4     of America versus Broderick Taylor, 1:18-cr-425.
 5              Representing the United States is Assistant U.S.
 6     Attorney Will Traynor, and representing the defendant is
 7     Suzanne Hashimi.
 8              We're here for a hearing on the defendant's motion
 9     to suppress evidence.
10              Are you ready to proceed?
11              MS. HASHIMI:  Yes, Your Honor.
12              MR. TRAYNOR:  Yes, Your Honor.
13              THE COURT:  Is there anything we need to take up
14     before we begin?
15              MS. HASHIMI:  I don't know that we need to do it
16     before we begin.  We can do it after the hearing.  But,
17     Judge, I'd just note for the record that I filed a motion to
18     dismiss that was past the time for filing pretrial motions
19     and -- but I filed the motion when it came to my attention
20     that it could be raised in this case, and I hope the Court
21     will consider it timely since it was done before the case was
22     resolved, at least on the motions.
23              THE COURT:  Any opposition to hearing the motion
24     out of that time?
25              MR. TRAYNOR:  No, Your Honor.
```

1    THE COURT:  All right.  So we'll wrap that into the
2    briefing schedule.

3    I take it it's just a facial attack on the
4    Indictment.  Is that right?  So this wouldn't in and of
5    itself -- it would just be a briefing issue, right?

6    MS. HASHIMI:  I thought about that yesterday, and I
7    don't think there's a need for an evidentiary hearing.  I
8    think it's a purely legal question for the Court to consider.
9    So I believe the government could submit their briefs and the
10   Court would have sufficient information to make a ruling.

11   THE COURT:  All right.  Good.  So then we will just
12   include that in the same briefing schedule that we set on the
13   motion to suppress.

14   All right.  So why don't we begin.  You may call
15   your first witness.  I assume y'all invoke the rule.

16   MR. TRAYNOR:  Yes, Your Honor.

17   THE COURT:  So I'll just charge both sides with
18   making sure there's no witnesses present other than the case
19   agent or the defendant, if he's to be a witness, or any
20   investigator.

21   MS. HASHIMI:  Just for the record, Your Honor, it's
22   my understanding from talking to Mr. Traynor that Officer
23   Jones is the only witness.

24   THE COURT:  Okay.  Well, that makes it even easier.
25   All right.  Thank you.

1    MR. TRAYNOR:  Thank you, Your Honor.  Your Honor,

2  the United States calls Officer Chris Jones.

3    Have a seat, please.

4    THE COURTROOM DEPUTY:  Please raise your right

5  hand.

6    You do solemnly swear or affirm that the statements

7  you are about to make in this case now pending before the

8  Court are the truth, the whole truth, and nothing but the

9  truth?

10    OFFICER CHRISTOPHER JONES:  I swear.

11    CHRISTOPHER JONES, PLAINTIFF'S WITNESS, SWORN

12    THE COURTROOM DEPUTY:  Thank you.  Please state and

13  spell your name for the record.

14    THE WITNESS:  My name is Officer R. C. Jones.  R.C.

15  J-o-n-e-s.

16    THE COURTROOM DEPUTY:  Thank you.

17                        DIRECT EXAMINATION

18  BY MR. TRAYNOR:

19  Q    Officer Jones, there's a bottle of water there if you

20  want to help yourself.

21  A    All right, sir.  Thank you.

22  Q    Would you tell the Court what you do for a living,

23  please?

24  A    I'm employed with the Cobb County Police Department.

25  I'm assigned to morning watch, Precinct Two.

1   Q    And how long have you worked for Cobb County?

2   A    I was hired in October of 2009.  I graduated mandate in

3   July '09.

4   Q    What do you do on -- what is "morning watch"?

5   A    Morning watch is the overnight shift, the graveyard

6   shift.  So I usually start my shift about -- at that time, it

7   would have been 2200 hours, and I usually get off about 06 or

8   07 hours.

9   Q    Did you work last night?

10   A    I did.  I did work last night.

11   Q    And when you work, are you a patrol officer?

12   A    I am a patrol officer.  I do routine patrol.  I answer

13   calls for service, patrols and stuff like that.

14   Q    Now, before you joined the Cobb County Police Department

15   in 2009, did you work in any other kind of law enforcement?

16   A    I did not.

17   Q    Now, now you work morning shift.  Let's -- I want you to

18   go back to last October 14th.  So October 14, 2018, were you

19   working about 9:30 that night?

20   A    I was, yes, sir.

21   Q    And what shift is that?

22   A    That's still morning watch.

23   Q    Okay.  And so on that night, October 14th, let me ask

24   you, did anything unusual happen around 9:30?

25   A    Yes.  I just got out of a squad meeting.  I actually

| | |
|---|---|
| 1 | hadn't gone in service yet.  I was actually going to get a |
| 2 | bite to eat before I went in service and I turned onto Clay |
| 3 | Road and I was traveling eastbound on Clay Road. |
| 4 | Q    And what part of Cobb County is this? |
| 5 | A    It's the South Cobb area, out in the Mableton area. |
| 6 | Q    So you were traveling east, and what kind of road is |
| 7 | Clay Road? |
| 8 | A    It's a two-lane road. |
| 9 | Q    And so it's 9:30 at night in October.  Is it dark? |
| 10 | A    Yes. |
| 11 | Q    And what happened that was -- got your attention? |
| 12 | A    As I passed Brookwood, as I believe I was -- I believe |
| 13 | Golden Pines Circle was the neighborhood.  I observed |
| 14 | headlights in my lane coming in my direction. |
| 15 | Q    And it's a two-lane road there? |
| 16 | A    It is, yes. |
| 17 | Q    So what did you do? |
| 18 | A    Luckily, there was a cemetery-type funeral home right |
| 19 | there.  I was able to veer to the right into the turn lane |
| 20 | and avoid being struck as the oncoming car veered into his |
| 21 | lane. |
| 22 | Q    And did you notice what kind of car it was? |
| 23 | A    Yes.  It was a white Dodge Charger. |
| 24 | Q    And once the car passed you, what did you do? |
| 25 | A    I immediately did a U-turn and proceeded to catch up to |

1    the vehicle.

2    Q    And would you describe -- were there -- in catching up

3    to the Dodge Charger, were there any other cars in between

4    you and it?

5    A    Not at this time, no.  As I got behind -- as I could see

6    the Dodge Charger maybe a football field away, as we

7    approached Brookwood Drive, at that a traffic light, I

8    observed a red traffic light and there was a vehicle stopped.

9    I observed the Dodge Charger go around that vehicle and

10   proceed through the traffic light as a car was coming off of

11   Brookwood turning left to turn east onto Clay Road.

12   Q    All right.  So at the intersection of Clay and

13   Brookwood, it has a traffic light?

14   A    It does.

15   Q    And is it also a two-lane paved road?

16   A    Yes, sir.

17   Q    Okay.  And then it sounds like it has a left-turn lane

18   in the direction -- now you're heading west, right?

19   A    That's correct.

20   Q    Okay.  So how did the Dodge Charger get around the car

21   that was waiting at the light?

22   A    It went into the left-turn lane and proceeded around the

23   car through the intersection, like I said, as a car was

24   coming up Brookwood to turn left.

25   Q    Was the light still red in the direction you were

1   traveling when the car did that?

2   A   Yes, sir.

3   Q   Now let me ask you, when you are -- when you were

4   driving on Clay -- I'm sorry.  When you were driving on Clay

5   and the car is coming in your direction in your lane, is it

6   violating any Georgia traffic laws?

7   A   Yes, sir.

8   Q   What would some of those be?

9   A   Driving on the wrong side of the road, failure to

10  maintain lane, reckless driving.

11  Q   All right.  And then when you've turned around, you've

12  done a U-turn and you see the white Charger go through the

13  red light, had you turned your blue lights on yet?

14  A   I had not.

15  Q   Okay.  And is it a violation of Georgia law to go

16  through a red light?

17  A   Yes, sir.

18  Q   All right.  So the car goes through Brookwood and the

19  red light.  What do you do?

20  A   I come to a stop.  As the light changes, I proceed

21  through the light.  As I proceeded through the light, I had

22  lost sight of the vehicle briefly.  At that time, I activated

23  my emergency lights and sirens to proceed to catch up to the

24  car to initiate a traffic stop.

25  Q   And how long did that take?

1   A     Maybe five, ten, 15 seconds to catch up.

2   Q     When you lost sight of the Charger there while you were

3   waiting for the light to change at Brookwood, was there a lot

4   of traffic on the road that night?

5   A     Not really.

6   Q     Okay.  And did you feel like the white Charger you

7   pulled was the car you had seen pass --

8              MS. HASHIMI:  Objection, Your Honor.

9              MR. TRAYNOR:  I'm sorry, Your Honor.  I'll rephrase

10  that.

11             THE COURT:  Rephrase.

12  BY MR. TRAYNOR:

13  Q     And what kind of car did you pull?

14  A     A white Dodge Charger.

15  Q     Okay.  And tell the Court, when you caught up to the

16  Charger -- well, did it stop for you?

17  A     It came to a stop and then we proceeded to a slow crawl.

18  Stop and go, stop and go, stop and go before it came to a

19  complete stop.

20  Q     And did you identify the driver of that white Charger?

21  A     Later on through my investigation.

22  Q     Okay.  And who was that?

23  A     Broderick Taylor.

24  Q     So when you were catching up to the Charger, did you

25  notice anything unusual?

A    Yes.  I observed an object being tossed out the
passenger-side window.  From my point of view, we were slowed
down enough that I observed a brown paper bag.

Q    And once you pulled the Charger, did you ever -- did any
other officer show up to help you?

A    Yes.  There were several officers that showed up in the
area to assist with the traffic stop.

Q    And how did you -- how did you approach Mr. Taylor?

A    Once the vehicle came to a complete stop, we were unsure
if he was -- what his intentions were when the stop and go,
stop and go.  So I was unsure if he had possession of a
weapon or if he was trying to conceal drugs.  We were unsure.
So we conducted a felony stop for officer safety reasons.

Q    And what does that mean?

A    Basically, we have him exit the vehicle with his hands
up and we call him back to us in a safe concealed area so we
can take him into custody.

Q    All right.  And you were able to do that without any
incident?

A    Yes.

Q    Did you ever go look for the brown paper bag?

A    Yes.  After officers arrived on the scene, I was able to
go back to the area where I saw the object being tossed.  I
located a paper bag containing, I believe, a blue Bud Light
bottle inside of the bag.

1    Q    Was there any Bud Light in it?

2    A    I believe it was cold to the touch and there was a

3    little bit of liquid in there.

4    Q    Now, when you were dealing with Mr. Taylor, did you

5    smell any alcohol about him?

6    A    I did.

7    Q    And when you were dealing with him, were you talking

8    with him face to face?

9    A    I was.

10   Q    So you have Mr. Taylor now.  You have the -- you have

11   the bottle.  Did you ever have any reason to go up -- did you

12   ever go up to the white Charger?  Did you or anybody else you

13   were working with?

14   A    Well, after we -- after we got him into custody, we

15   walked up, cleared the car and made sure there was nobody

16   else in the car.

17        I returned back.  Like I said, I went and retrieved the

18   paper bag.

19        When I returned back to the traffic stop, my sergeant

20   explained to me that, Hey, I smell the odor of marijuana

21   emitting from inside the vehicle.

22   Q    And had you smelled or did you smell any marijuana?

23   A    I did, yes, sir.

24   Q    And when did you first smell the marijuana?

25   A    When I went up to the vehicle.

1    Q    The first time?

2    A    Not initially the first time, no.

3    Q    Okay.  After your sergeant told you that?

4    A    Yes.

5    Q    And what did you do once you smelled marijuana?

6    A    We conducted a search of the vehicle.

7    Q    Did you find anything during the search?

8    A    We did not find any contraband, no, sir.

9    Q    Did you find any weapons?

10   A    We did.  In the center console, I located a revolver in

11   the center console.

12   Q    All right.  Do you remember the make and model?

13   A    I believe it was a Taurus Judge.

14   Q    Now, you have Mr. Taylor in custody.  Were you going to

15   arrest him for anything?

16   A    Yes.  As soon as he was placed in handcuffs I explained

17   to him, You are under arrest for reckless driving.

18   Q    And in that situation, what would happen to Mr. Taylor's

19   car?

20   A    If there wasn't a smell of marijuana, we would not have

21   searched it; but we do do -- per Cobb County policy, we do do

22   an inventory of the vehicle before it is impounded to make

23   sure everything that's of value is documented.

24   Q    All right.  Was there anyone else in the car with him?

25   A    No, sir.

Q    All right.  Anyone else -- all right.  So you were going
to impound the car anyway?

A    That's correct.

Q    And then Cobb County -- I'm sorry.  I'm trailing it too
much.

     Does Cobb County have a policy about searching cars
before you impound them?

A    Not a search of the car, but I inventory to make sure
that all the items of value are documented.

Q    All right.  And did you find anything besides the pistol
in the car?

A    I can't recall.

Q    All right.  And where did you find the pistol?

A    In the center console.

Q    Now, did you then arrest Mr. Taylor that night?

A    I did.

Q    And what did you charge him with?

A    After doing the inventory of the vehicle, I returned
back to my vehicle.  I made him aware of his Miranda rights.
I explained to him that I had reason to believe that he was
under the influence of alcohol, and I conducted a D.U.I.
investigation, which led to him being charged with D.U.I. as
well.

Q    All right.  And did you eventually take him back to a
precinct to blow --

1   A    I did, and he did an intox at our precinct before taking

2   him up to the Cobb County jail.

3   Q    All right.  And do you remember what he blew on the --

4   A    I do not have that on me right now.

5   Q    All right.  Did you do a report of this whole incident?

6   A    I did.

7   Q    All right.  If I showed you a copy of that report, do

8   you think that would refresh your recollection about Mr.

9   Taylor, what -- his performance on the Breathalyzer?

10  A    Yes, sir.

11  Q    Okay.  Let me show you -- just look that over.  Don't

12  read it out loud.  Let me know if that refreshes your

13  recollection.

14  A    It does.

15  Q    Okay.  And what did Mr. Taylor blow that night?

16  A    He provided two samples.  One was a .133 and the second

17  was a .132.

18  Q    And what is the level for driving under the influence in

19  Georgia?

20  A    It's .08.

21  Q    Now, the white Dodge Charger, did you run its tag or see

22  who it's registered to?

23  A    Yes, sir.

24  Q    Okay.  Who is it registered to?

25  A    I believe it was registered to his father.  I don't have

1    that on me right now, but I believe it was.

2    Q    Mr. Taylor's father?

3    A    Yes, sir.

4    Q    All right.  Let me show you what's been marked for

5    identification as United States Exhibits 1 and 2.  Would you

6    take a look at those, please.

7         Do you recognize Number 1?

8    A    Yes, sir.

9    Q    And what is it?

10   A    It is a dash cam of my traffic stop.

11   Q    All right.  And have you looked at that, the contents of

12   that disk?

13   A    Yes, we looked at it this morning.

14   Q    All right.  And is that a fair and accurate copy of the

15   recording of your dash cam?

16   A    Yes, sir, it is.

17   Q    And that's the night you pulled Mr. Taylor?

18   A    Yes, sir.

19   Q    All right.  And what is Exhibit Number 2?

20   A    Exhibit 2 is a body cam footage of the traffic stop.

21   Q    And is that a fair and accurate copy of the recording

22   from your body cam from that night?

23   A    It is.

24   Q    All right.

25             MR. TRAYNOR:  Your Honor, I'd move for admission of

1    Exhibits 1 and 2.

2              MS. HASHIMI:   No objection.

3              THE COURT:   All right.   They're admitted.

4              MR. TRAYNOR:   Thank you.

5    BY MR. TRAYNOR:

6    Q    All right.   Now, Officer Jones, could you explain about

7    the dash cam?   Could you tell the Court, when does the dash

8    cam start recording?

9    A    The dash cam is 30-second pre-record prior to activating

10   my lights, my emergency equipment, or if I reach up and turn

11   it on.   So either I activate it manually or I flip it on.

12   There's going to be a 30-second pre-record.

13   Q    So what does that mean, a 30-second pre-record?

14   A    So in this instance, it caught the Charger on the wrong

15   side of the road prior to me activating my lights and sirens.

16   Q    All right.   So is it 30 seconds before the hit the

17   lights?

18   A    Yes.

19   Q    Okay.   And then how about your body cam, how does that

20   work?

21   A    My body cam, mine is not hooked up to my vehicle.   I

22   have to manually turn it on.

23   Q    And how long does it stay running?

24   A    Until I turn it off.

25   Q    And do you have a policy about when you're supposed to

1    turn it on and off?

2    A    No, sir.

3    Q    Okay.  And when did you turn it on in this case?

4    A    I turned it on immediately, I believe, when I jumped out

5    of the vehicle.

6    Q    Well, thank you.

7         MR. TRAYNOR:  I have no more questions, Your Honor.

8         THE COURT:  Ms. Hashimi?

9                    CROSS-EXAMINATION

10   BY MS. HASHIMI:

11   Q    Officer Jones, my name is Suzanne Hashimi, and I

12   represent Mr. Taylor.  I just have a few questions for you.

13   A    Yes, ma'am.

14   Q    Now, you indicated that you're driving eastbound on Clay

15   Road on a dark night when you see a car approaching that has

16   crossed over the center line, correct?

17   A    Yes, ma'am.

18   Q    Now, you have also referenced charges, I believe, on

19   direct that that particular movement by the car could

20   generate, right?

21   A    Could you rephrase that, please?

22   Q    Okay.  You indicated on direct that the car moving

23   outside the -- of its lane could result in several different

24   charges?

25   A    That's correct.

1  Q    And you mentioned one of them was crossing the center

2  line?

3  A    That's correct.

4  Q    Okay.  Now, at the time, at that precise moment when you

5  see the car crossing the center line, you didn't know what

6  caused the car to go across the center line, right?

7  A    I did not.

8  Q    You didn't know if the driver sneezed, got distracted or

9  was drinking?

10  A    I had no idea.

11  Q    No idea, right?

12  A    No, ma'am.

13  Q    And, thankfully, because of that -- let me make sure I

14  got the right one -- the dash cam with that 30-second

15  mechanism, Judge Anand will be able to look at that dashboard

16  and he will see what you saw, which is the car crossing that

17  center lane and you making your U-turn to pursue it, right?

18  A    Yes, ma'am.

19  Q    And what Judge Anand will also be able to see is for

20  approximately one minute and 15 seconds, you pursued what you

21  would later identify is a Dodge Charger, a white Dodge

22  Charger, right?

23  A    Yes, ma'am.

24  Q    Okay.  And while you're looking at that dash cam in that

25  first minute and 15 seconds, you can see or, as I said, Judge

1    Anand will be able to see right through your front window,

2    right?

3    A    Yes, ma'am.

4    Q    Okay.  And that's where it's pointing to, right?

5    A    Yes, ma'am.

6    Q    And he will see that the white Dodge Charger is not in

7    your line of vision at all times, correct?

8    A    That's correct.

9    Q    Okay.  So we can agree that the car you saw when it

10   crossed the center lane was at times not visible to you in

11   your pursuit of the car?

12   A    That's correct.

13   Q    Okay.  Now, you indicated, I believe, that when the

14   Dodge Charger pulled over -- that's visible on the dash cam

15   too, right?

16   A    Yes.

17   Q    So Judge Anand will be able to see that as you

18   approached that car, that car slowed down and came to a

19   complete stop, correct?

20   A    I believe it came to a complete stop at first and then

21   continued to roll.

22   Q    But it came to a complete stop pretty quickly, right?

23   A    I believe so, yes.

24   Q    We're not talking miles?  We're talking about a couple

25   of feet, right?

1    A    Yes, ma'am.

2    Q    Okay.  And at that moment in time, just freeze frame

3    that moment, when you're in your car and that car is stopped

4    in front of you, you don't see anything in the car, inside

5    the car that causes you to do what you call a felony stop,

6    right?

7    A    Can you -- immediately when he stopped?

8    Q    Right.  Right when he stopped and you stopped, you

9    didn't -- your decision to do a felony stop was based on what

10   you had seen up to that moment, right?

11   A    The driving and then when he stopped and he started to

12   roll, yes, ma'am.

13   Q    Again, when he stopped, right?

14   A    The final stop?

15   Q    Yes, whatever it was.

16   A    Okay.

17   Q    You were basing your decision to do a felony stop on

18   that conduct, right?

19   A    Yes, ma'am.

20   Q    Okay.  You didn't base it on any conduct inside the car

21   that you saw visible?

22   A    That's correct.  Yes, ma'am.

23   Q    And, indeed, you -- and Judge Anand will be able to see

24   this, is you direct -- or he simultaneously sticks his arms

25   out the window?  Was that at your direction or did he do it

1    before you told him?

2    A    I can't recall that.

3    Q    It was pretty quick?

4    A    It was pretty quick.  It was about the same time I was

5    telling him to put his hands up.

6    Q    You would have told him that?

7    A    Yes, ma'am.

8    Q    And he did it, whether he was complying or just did it

9    instinctively?

10   A    Yes, ma'am.

11   Q    And then we can see on the dash cam you holler at him

12   and say, Open the door -- I think -- with your left hand.

13   Keep your right hand -- I'm going to get them mixed up.  Keep

14   your right hand out extended.  Right?

15   A    Yes, ma'am.

16   Q    Okay.

17   A    Along those lines, yes.

18   Q    Okay.  And he follows that instruction.  He opens the

19   door.  You're fussing at him because you thought he wasn't

20   going fast enough, but he does open the door and come out of

21   the car, right?

22   A    That's correct.

23   Q    And then you tell him what you want him to do is to keep

24   his hands in the air, right?

25   A    Yes, ma'am.

1    Q    And then you ask him to walk backwards?

2    A    That's correct.

3    Q    And he did that?

4    A    Yes, ma'am.

5    Q    Okay.  And when he gets far enough back, he finally

6    reaches the point where you're standing, right?

7    A    Yes, ma'am.

8    Q    And at that moment you put him in cuffs, right?

9    A    Yes, ma'am.

10   Q    And you arrest him?

11   A    Me personally did not put him in cuffs.  I believe

12   another officer did.

13   Q    Another officer?

14   A    Yes, ma'am.

15   Q    Puts him in cuffs, right?

16   A    Yes, ma'am.

17   Q    And he's arrested?

18   A    Yes, ma'am.

19   Q    Okay.  And then you take him -- do you take him and put

20   him in your car immediately or did he stand there?  What did

21   he do?

22   A    He stood with another officer.  Myself and, I believe,

23   Officer Rodriguez approached the vehicle and cleared it to

24   make sure there was no one else in the vehicle.

25   Q    And that was done at approximately three minutes into

1    this stop, right?

2    A    I can't recall the time.

3    Q    Well, at four minutes and twelve seconds into the stop,

4    the car is searched, right?

5    A    I don't know the time frame.

6    Q    Judge Anand will be able to check that on the tape?

7    A    Yes, ma'am.

8    Q    And he will see, will he not, when you were clearing the

9    car?

10   A    Yes, ma'am.

11   Q    And he'll know he's at that moment because, actually,

12   through officers, including you, I believe, approach the car

13   slowly with your guns drawn to see if there's somebody left

14   in the car, right?

15   A    Yes, ma'am.

16   Q    And at that moment when that's happening, that's when

17   he's putting the car back there?

18   A    I believe so, yes, ma'am.

19   Q    Okay.  So he's under arrest.  He's in the car.  And then

20   at that point, you say that you subsequently searched the

21   car, right?

22   A    (No response.)

23   Q    You or some other officer on the scene?

24   A    I didn't go near the car until after --

25   Q    That's what I mean.  After he's put away?

1   A    Right.  I go over and retrieve the bag and then I

2   return.  That's when I actually myself --

3   Q    Okay.  Because you step away at that point?

4   A    Yes, ma'am.

5   Q    And you try to find that brown paper bag?

6   A    That's correct.

7   Q    Okay.  And you find the brown paper bag.  You come back

8   to the scene?

9   A    Yes, ma'am.

10   Q    And at that time, the other officers and you -- I wasn't

11   sure.

12   A    Yeah.

13   Q    But the other officers, somebody searches the car?

14   A    I don't know if somebody went into the car and searched

15   or they just opened the doors.

16   Q    Okay.  But you saw and you can see on the videotape that

17   when they go to look in the car, you see one officer pop the

18   trunk, you see the officer go to the passenger side, look in.

19   You see an officer on the driver's side --

20   A    Yes, ma'am.

21   Q    -- open the door, look in and they've got flashlights

22   and they're looking around?

23   A    Yes, ma'am.

24   Q    Now, during the course of that search, you didn't find

25   any marijuana?

1    A    No, ma'am.

2    Q    So the only thing we know about marijuana is what you

3    claim you smelled and claim your fellow officer or supervisor

4    smelled in the car, right?

5    A    That's correct.

6    Q    That's all we've got?

7    A    Yes, ma'am.

8    Q    Not residue, nothing in the car?

9    A    That's correct.

10   Q    Okay.  Now, you indicated that after an inventory of the

11   car was conducted, you gave Mr. Taylor his Miranda rights?

12   A    That's correct.

13   Q    Okay.  So there is a gap in time between his arrest and

14   giving of the Miranda rights, right?

15   A    That's correct.

16   Q    And in that interval -- we'll be able to check the time

17   on that -- we'll see that the car is searched and

18   inventoried?

19   A    That's correct.

20   Q    And then you go back to the car, right?

21   A    Yes, ma'am.

22   Q    Is he in your car?

23   A    He's in my car, yes, ma'am.

24   Q    Okay.  So you get in your car.  Is that when you read

25   him the Miranda rights?

1   A    I was -- I believe I was outside my car when I read him

2   the Miranda rights.

3   Q    You were standing --

4   A    I had to roll down my -- the rear window.

5   Q    Oh, okay.  So he's in the car and you're outside the car

6   and you read him the Miranda rights?

7   A    Yes, ma'am.

8   Q    Okay.

9            MS. HASHIMI:  If I might have a moment, Your Honor?

10            THE COURT:  Yes.

11            MS. HASHIMI:  Nothing further at this time, Your

12   Honor.

13            THE COURT:  Mr. Traynor, any redirect?

14            MR. TRAYNOR:  Thank you, Your Honor.

15                        REDIRECT EXAMINATION

16   BY MR. TRAYNOR:

17   Q    Officer Jones, just one thing.  So you took Mr. Taylor

18   to the jail?

19   A    That's correct.

20   Q    And do you know what happened to the Charger?

21   A    It was impounded.

22   Q    Thank you.

23   A    Yes, sir.

24            MR. TRAYNOR:  I have nothing further, Your Honor.

25            THE COURT:  Okay.  Officer Jones, you may step

1   down.

2           THE WITNESS:  Yes, sir.

3           MR. TRAYNOR:  That's it for the United States, Your

4   Honor.

5           THE COURT:  All right.

6           Any evidence for the defense?

7           MS. HASHIMI:  No.  We just, obviously, urge the

8   Court to carefully examine the body cam.

9           THE COURT:  Well, it's in evidence, and I'll rely

10  on counsel in your briefs to point me to anything specific.

11  Where we have video or audio footage, I'll rely on you all to

12  point to me what is significant that I should look at.  I'll

13  expect y'all to do that.  In other words, don't assume that

14  I'll necessarily see what you view as significant.  You've

15  got to argue that to me in the briefs.

16          I assume there are -- there's a time counter or

17  something on there that will allow --

18          MR. TRAYNOR:  Yes.

19          THE COURT:  -- a record?

20          MS. HASHIMI:  Yes.  It's one thing -- I should have

21  clarified this, perhaps, with Officer Jones on the stand, and

22  maybe Mr. Traynor can, is when I was watching it before, I

23  noticed that, for example, on the dash cam, it starts at,

24  like, you know -- it's at the very beginning.  It just says

25  zero minutes to, I think, 34 or something like that, whereas

1    the body cam, I think, is on a clock.

2         And I don't know how the clock, which is telling

3    us, presumably in real time, what time things are happening,

4    how that coordinates with the zero to 34 minutes.

5         And I guess the only thing I know of -- and, again,

6    Mr. Traynor can clarify this -- is that Officer Jones

7    testified that he turned his body cam on at a particular

8    time.  And so maybe if we could figure out that moment, we'll

9    be able to coordinate the two clocks, because there are two

10   different clocks.

11        THE COURT:  If this is a factual question, then we

12   have Officer Jones here, and if he knows the answer, we can

13   put him back on the stand.

14        If it's a question of counsel just making sure

15   there's consistency in how we're citing so we're not citing

16   different things, then that's something that y'all can work

17   out.

18        Do we need to resolve the factual question?

19        MR. TRAYNOR:  I think it's the old problem of two

20   different things with two different clocks.

21        THE COURT:  Okay.

22        MR. TRAYNOR:  So we may just end up citing the dash

23   cam, using the dash cam system.

24        THE COURT:  Okay.

25        MS. HASHIMI:  Well, if I could, Your Honor, I

1    wouldn't mind, if the Court wouldn't mind, just clarifying

2    that one point with Officer Jones so I can get it as close as

3    here.

4            THE COURT:  All right.  Well, he's still here, and

5    that seems like a simple enough question.

6            So, Officer Jones, if you would -- I guess I'll

7    treat this as the defense calling a witness.  I guess we'll

8    have you sworn again, technically, since we had excused you

9    before.

10           THE COURTROOM DEPUTY:  You do solemnly swear or

11   affirm that the statements you are about to make in this case

12   now pending before the Court are the truth, the whole truth,

13   and nothing but the truth?

14           OFFICER CHRISTOPHER JONES:  I swear.

15           CHRISTOPHER JONES, DEFENDANT'S WITNESS, SWORN.

16                       DIRECT EXAMINATION

17   BY MS. HASHIMI:

18   Q    Just so we're clear -- you were in court when I just

19   made that comment.  And just to be clear, there's a clock

20   running on the dash cam, but it's not a timed clock?  It's

21   just zero to however many minutes the counter lasts, right?

22   A    From what I saw on the video, yes.

23   Q    Okay.  So am I right?  Is it about 35 minutes?

24   A    From the video, yes, I believe it was about 35 minutes.

25   Q    Okay.  But the body cam, you said, if I heard you

1  correctly, that you turned that on when you got out of the

2  car?

3  A    I turned it on either right when I was getting out of

4  the car or right when I stepped out of the car.

5  Q    Okay.  So if we were to look at the time it gets turned

6  on and we would be able to know certainly it would be within

7  seconds of the body cam that you step out of the car that we

8  can see on the dash cam?

9  A    Yes, ma'am.

10  Q    Okay.  So it would be within seconds?

11  A    Yes, ma'am.

12  Q    Okay.

13           MS. HASHIMI:  I think that will get us close

14  enough, Judge.  Thanks.

15           THE COURT:  All right.

16           Any cross on that?

17           MR. TRAYNOR:  No, Your Honor.

18           THE COURT:  Okay.  Very good.

19           Officer Jones, you may step down again.

20           THE WITNESS:  Thank you.

21           THE COURT:  All right.  So in terms of the

22  schedule, then, what do you think for the transcript?  Two

23  weeks, do you think?  Do you think the transcript will be

24  available in two weeks?

25           (Discussion off the record between the Court and

```
 1    the court reporter.)

 2              THE COURT:  Okay.  So the transcript will be

 3    available likely by the end of the day, the court reporter

 4    believes.

 5              So, Ms. Hashimi, what would you need, then, for an

 6    opening initial brief?

 7              MS. HASHIMI:  Let me look, Judge.

 8              Could I have until April 22nd?

 9              THE COURT:  Is there a trial or something?  This is

10    a pretty small record and a pretty simple case.

11              MS. HASHIMI:  I understand, Judge.  I had a cert

12    petition due earlier, and I'm trying to schedule -- my mother

13    recently broke her hip, and so I've been trying to schedule

14    visits.  So I'm just trying to figure out between that

15    schedule.

16              If the Court wants me to do it sooner. . .

17              THE COURT:  Well, I mean, that's all right.

18              MS. HASHIMI:  Maybe I could do it by April 18th, if

19    the Court wants.

20              THE COURT:  Well, how about this.  We'll put it

21    down for the 18th, and if you face a hardship, then we can

22    adjust that.  But we'll put that down for April 18th.

23              And, Mr. Traynor, how long then to respond?  And I

24    think maybe your response would include your response to the

25    motion to dismiss as well.
```

1       MR. TRAYNOR:  Yes, Your Honor.  Could I have two

2   weeks?

3       THE COURT:  That's fine.  So that would be May 2nd.

4       And then rounding up to the end of the following

5   week, would May 10th be sufficient for a reply?

6       MS. HASHIMI:  Yes, Judge.

7       THE COURT:  All right.  Great.

8       Okay.  That's that.  That'll be the schedule.

9       Anything else then for purposes of today?

10       MR. TRAYNOR:  Nothing for the United States, Your

11   Honor.

12       MS. HASHIMI:  No, Your Honor.

13       THE COURT:  All right.  We will be in recess, then.

14   Thanks very much.  Have a good weekend.

15       (Proceedings concluded at 10:20 a.m.)

16                    - - - - - - - -

17                Reporter's Certification

18   I certify that the foregoing is a correct transcript from the

19   record of proceedings in the above-entitled matter.

20                        s/Diane Peede, RMR, CRR, CRC
                         Official Court Reporter
21                        United States District Court
    Date:  April 1, 2019      Northern District of Georgia
22